Brad BENNETT; Mario Giordano; Langell Valley Irrigation District, a political subdivision of the state of Oregon; Horsefly Irrigation District, a political subdivision of the State of Oregon, Plaintiffs–Appellants,

v.

Marvin L. PLENERT, in his official capacity as Regional Director, Region One, Fish and Wildlife Service, U.S. Department of the Interior; John F. Turner, in his official capacity as Director, Fish and Wildlife Service, U.S. Department of the Interior; Bruce Babbitt, in his official capacity as Secretary, U.S. Department of the Interior, Defendants–Appellees.

No. 94–35008.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1995.

Decided Aug. 24, 1995.

William F. Schroeder, Schroeder, Hutchens & Sullivan, Vale, OR, for plaintiffs-appellants.

Ellen J. Durkee, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Before: PREGERSON *, CANBY, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

This case requires us to determine whether plaintiffs who assert no interest in preserving endangered species may sue the government for violating the procedures established in the Endangered Species Act. We conclude that they may not.

### I.

The plaintiffs are two Oregon ranch operators and two irrigation districts located in that state. They challenge the government's preparation of a biological opinion which concludes that the water level in two reservoirs should be maintained at a particular minimum level in order to preserve two species of fish. The plaintiffs, who make use of the reservoir water for commercial (and recreational) purposes, bring this action under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.,* the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.,* and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C).

The two reservoirs in question are part of the federal government's Klamath Project, which the Bureau of Reclamation administers. The Bureau concluded that the long term operation of the Klamath Project might adversely affect two species of fish: the Lost River and shortnose suckers. Pursuant to the requirements of the ESA, the Bureau consulted with the United States Fish and Wildlife Service in order to assess the impact of the Klamath Project on the fish. 16 U.S.C. § 1536(a)(2).

As a result of the consultation, the Service prepared a biological opinion. 16 U.S.C. § 1536(b)(3)(A). The opinion concluded that unless mitigating actions were taken the "long-term operation of the Klamath Project was likely to jeopardize the continued existence of the Lost River and shortnose suckers." The opinion "recommended a number of measures the [Bureau] could take to avoid jeopardy to the suckers ... including the recommendations regarding maintaining minimum lake level at issue in this case." The Bureau informed the Service that it accepted the opinion's recommendations and intended to comply with them.

The plaintiffs filed suit for declaratory and injunctive relief in an effort to compel the government to withdraw portions of the biological opinion. Their complaint alleges that there is no evidence to support the opinion's conclusion that the long-term operation of the Klamath project will adversely affect suckers. In fact, the complaint alleges that the evidence shows that the fish are "reproducing successfully" and are not in need of special protection. The complaint then explains that the plaintiffs' objective in seeking to prevent the government from raising the minimum reservoir levels is to ensure that more water will be available for their own commercial (and recreational) use. In short, they wish to use for their own purposes some of the water that the government maintains is needed to ensure the survival of the suckers.

The complaint alleges that in preparing the opinion, the government violated the consultation provisions set forth in 16 U.S.C. § 1536(a) of the ESA. It also alleges that the government violated 16 U.S.C. § 1533(b)(2) of the ESA by failing to consider the economic impact of its determination

---

* Judge Tang was originally a member of this panel and heard argument in this case. Judge Tang died prior to circulation of this opinion, and pursuant to General Order 3.2(g), Judge Pregerson was drawn as a replacement. Judge Pregerson was furnished with a tape of the oral argument as well as the briefs and other materials received by the other members of the panel.

that the reservoirs constituted critical habitats for the suckers. They bring related claims pursuant to the APA and NEPA.

The government moved to dismiss the complaint for lack of standing. The district court concluded that the plaintiffs' interest in utilizing the Klamath water for commercial and recreational purposes "conflict[s] with the Lost River and shortnose suckers' interest in using water for habitat." Accordingly, it concluded that the plaintiffs lacked standing because their claims were premised on "an interest which conflicts with the interests sought to be protected by the Act."

## II.

■ The issue before us is not whether the plaintiffs have satisfied the constitutional standing requirements but whether their action is precluded by the zone of interests test, the prudential standing limitation that the district court deemed dispositive.[1]

The zone of interests test first appeared as a standing requirement in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). There, the Court held that a plaintiff seeking judicial review under the Administrative Procedure Act (APA) must show that "the interest sought to be protected by [him was] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. at 830. In the decade that followed, the test appeared to be on the verge of being abandoned. However, in 1987, the Court resuscitated it, offering an "exegesis" regarding when the test applies and how a court should determine whether it has been met. *See*

*Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 410, 107 S.Ct. 750, 762–63, 93 L.Ed.2d 757 (1987) (Stevens, J. concurring in part).

In a lengthy footnote, the *Clarke* Court made it clear that some form of the zone test applies even in cases which are not brought under the Administrative Procedure Act. However, it cautioned that "[w]hile inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a 'zone of interest' inquiry under the APA, it is not a test of universal application." *Clarke,* 479 U.S. at 400 n. 16, 107 S.Ct. at 757 n. 16. Perhaps because the Court did not proceed to explain how the test might differ when applied to non-APA actions, our court, like most others, has continued to apply the traditional zone of interests test to such actions, as well as to APA cases. *See, e.g., Central Arizona Water Conservation District v. EPA,* 990 F.2d 1531, 1538–39 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993) (Clean Air Act); *Self–Insurance Institute v. Korioth,* 993 F.2d 479, 484 (5th Cir.1993) (preemption); *ANR Pipeline v. Corporation Commission of State of Oklahoma,* 860 F.2d 1571, 1579 (10th Cir. 1988), *cert. denied,* 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989) (same); 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3531.7 (Supp.1993). We follow that practice here.

*Clarke*'s principal relevance to the case before us is its holding regarding when a plaintiff who is not directly subject to the regulatory action that he seeks to challenge falls within the zone of interests.[2] As to such plaintiffs, *Clarke* holds that "the test denies a right of review if the plaintiff's interests are

1. We note that the zone of interests test applies even to plaintiffs who have established constitutional standing premised on a procedural injury. *See Douglas County v. Babbitt,* 48 F.3d 1495, 1500–1501 (9th Cir.1995) (applying the prudential zone of interests test after concluding that the plaintiffs had procedural standing to assert a claim) (citations omitted); *Yesler Terrace Community Council v. Cisneros,* 37 F.3d 442, 447 (9th Cir.1994) (same). Accordingly, we need not address whether the plaintiffs have procedural, or as it is sometimes known, "footnote seven" standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570–573 n. 7, 112 S.Ct. 2130, 2142–2143 n. 7, 119 L.Ed.2d 351 (1992). *See also*

*Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 921 n. 2 (D.C.Cir.1989) (explaining that standing may be decided on prudential grounds without first undertaking the constitutional inquiry).

2. None of the plaintiffs is directly subject to the regulatory action. Rather, it is the Bureau of Reclamation which would be required to act if any rules regarding reservoir water levels are ultimately adopted. We do not consider here when a directly regulated entity, or a party standing in the shoes of such an entity, would have standing.

so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit." *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757; *see also Central Arizona,* 990 F.2d at 1538–39 (9th Cir. 1993) (quoting same).

*Clarke* explains that the zone of interests test simply provides a method of determining whether Congress intended to permit a particular plaintiff to bring an action. As the *Clarke* Court made clear, "at bottom the reviewability question turns on congressional intent, and all indicators helpful in discerning that intent must be weighed." *Clarke,* 479 U.S. at 400, 107 S.Ct. at 757. Thus, *Clarke* concludes that the statutory purposes should be divined by considering the particular statutory provision that underlies the complaint within "the overall context" of the act itself. *Clarke,* 479 U.S. at 401, 107 S.Ct. at 758.

### III.

We have previously applied the zone of interests test to claims brought directly under the ESA. *See Pacific Northwest Generating Co–Op v. Brown,* 38 F.3d 1058, 1065 (9th Cir.1994); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1581 & n. 8 (9th Cir. 1993). However, the plaintiffs contend that these cases do not conclusively demonstrate that the zone of interests test applies here. They argue that the question of the test's application is an open one because our past cases did not consider whether the ESA's citizen-suit provision overrides the limitation on standing that the test imposes. 16 U.S.C. § 1540(g); *see Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (holding that Congress may extend standing under a statute to the limits of Article III).[3] The provision in question authorizes "any person [to] commence a civil suit on his own behalf—a) to enjoin any person, including the United States [and its agencies], who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof. . . ." *See* 16 U.S.C. § 1540(g).

■ We need not rely on our decisions in *Mt. Graham* and *Pacific Northwest.* Rather, notwithstanding the broad language of the citizen-suit provision, we directly reject the plaintiffs' contention that it renders the zone of interests test inapplicable to claims brought under the ESA.[4] Our conclusion follows from the fact that our court, and others, have regularly employed the zone of interests test in determining standing despite Congress' enactment of expansive citizen-suit provisions.

For example, in *Gonzales v. Gorsuch,* 688 F.2d 1263, 1266 (9th Cir.1982), we considered whether a plaintiff had standing under the Clean Water Act's citizen-suit provision to complain that the EPA was unlawfully expending funds for purposes other than the improvement of water quality. In answering the question, we considered not only the provision of the statute which permitted "any citizen" to sue for a violation of the Act, but also the legislative history. We concluded that the plaintiff had standing because the citizen-suit provision was "intended to grant standing to a nationwide class, comprised of citizens *who alleged an interest in clean water.*" *Id.* (emphasis added).

Subsequent to *Gonzales,* we concluded that the Clean Water Act's citizen-suit provision

---

3. There is a division in the circuits as to whether the zone of interests test applies to ESA suits. The District of Columbia Circuit, notwithstanding the citizen-suit provision, has expressly held that the zone of interests test applies. *State of Idaho By and Thru Idaho Public Utilities Commission v. ICC,* 35 F.3d 585, 592 (D.C.Cir.1994); *see also Humane Society of the United States v. Hodel,* 840 F.2d 45 (D.C.Cir.1988); *National Audubon Society v. Hester,* 801 F.2d 405, 407 (D.C.Cir.1986). By contrast, the Eighth Circuit has concluded that ESA's citizen-suit provision necessarily abrogated any zone of interests test. *See Defenders of Wildlife v. Hodel,* 851 F.2d 1035, 1039 (8th Cir.1988), opinion after remand, 911 F.2d 117 (8th Cir.1990), *rev'd on other grounds*

*sub nom., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

4. We note that, whether or not the zone of interests test applies, the class of plaintiffs that Congress had in mind was necessarily more limited than the literal language of the citizen-suit provision suggests. As *Lujan* makes clear, Congress may not permit suits by those who fail to satisfy the constitutionally-mandated standing requirements. For that reason, suits under the ESA, no less than suits under any statute, are clearly not available to "any person" in the broadest possible sense of that term. *See Lujan,* 504 U.S. at 570–580, 112 S.Ct. at 2142–2146.

did *not* confer standing on a plaintiff who claimed that the government's failure to comply with the statute deprived him of grant funds. *See Dan Caputo Co. v. Russian River County Sanitation,* 749 F.2d 571, 575 (9th Cir.1984). We based our holding on the fact that the plaintiff's injury did not "arise from an interest in the environment," and the fact that he did "not seek to vindicate environmental concerns." *Id.*

We applied a similar analysis in construing a different statute. In *Alvarez v. Longboy,* 697 F.2d 1333, 1337 (9th Cir.1983), we considered whether a provision of the Farm Laborer Contractor Registration Act (FLCRA) that permitted suit by "[a]ny person claiming to be aggrieved" by a violation of the act conferred standing on migrant workers to sue farm labor contractors with whom they had no contract. *See* 7 U.S.C. § 2050a(a).[5] We concluded that it did, but only after carefully considering the overall purposes of the act to determine whether the particular plaintiff fell within the zone of interests that the statute protected. *Alvarez,* 697 F.2d at 1337–38.

The Eleventh Circuit employed the same approach in construing the FLCRA. *Davis Forestry Corporation v. Smith,* 707 F.2d 1325, 1328 (11th Cir.1983). After analyzing the purposes of the act, the court concluded that the provision authorizing suits under the FLCRA did not confer standing on competitors of farm labor contractors to bring an action for a violation of the statute. It explained that their claimed injury fell outside "the zone of interests sought to be protected" by the statute. *Id.* In so concluding, the court explained that:

> The FLCRA was designed to alleviate a parade of horribles being inflicted upon farm laborers (primarily migrant farm workers). While "any person" may be read to include many possibilities, we do not find any basis for extending it to [the plaintiff] for the type of claim alleged here.

*Id.* at 1329.

In sum, the fact that a statute contains a citizen-suit provision does not necessarily es-tablish that Congress intended that any particular plaintiff have standing to assert a violation. In light of our consistent use of the zone of interests test in determining the standing of plaintiffs who have sued under citizen-suit provisions, we hold that the ESA does not automatically confer standing on every plaintiff who satisfies constitutional requirements and claims a violation of the Act's procedures. A contrary ruling would permit plaintiffs to sue even though their purposes were plainly inconsistent with, or only "marginally related" to, those of the Act. *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. Thus, we apply the zone of interests test here.

### IV.

■ Having concluded that the zone of interests test applies, we must next determine whether the ESA protects plaintiffs who assert an interest of the type asserted here. We answer that question in the negative, holding that only plaintiffs who allege an interest in the *preservation* of endangered species fall within the zone of interests protected by the ESA. Because the plaintiffs have not alleged such an interest in their complaint, they do not have standing.

In reaching our conclusion, we follow the approach that we have adopted in applying the zone of interests test to claims brought pursuant to other environmental statutes. In those cases, we declined to confer standing on plaintiffs who asserted interests similar to those that underlie the claims in this case; we concluded that the asserted interests were not tied to the environmental purposes served by the respective statutes. For example, as we have explained *supra* at page 10656, we denied standing under the Clean Water Act to a plaintiff who sought grant funds but did not assert an interest that "ar[o]se from an interest in the environment" or "environmental concerns." *See Dan Caputo Co. v. Russian River County Sanitation,* 749 F.2d 571, 575 (9th Cir.1984). Similarly, we held that plaintiffs do not have

---

5. The inclusion of the language "claiming to be aggrieved" does not distinguish the statute from the one we consider here. As we have explained, the constitution necessarily limits standing to plaintiffs who are, at the least, aggrieved; i.e., persons who suffer constitutional injury.

standing under NEPA to protect "purely" economic interests, because the environmental purposes of the Act would not be furthered by permitting suits premised on such interests. *See Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 716 (9th Cir.1993).

We see no reason why the ESA should be construed in a different manner from either NEPA or the Clean Water Act.[6] The overall purposes of the ESA are singularly devoted to the goal of ensuring species preservation; they do not embrace the economic and recreational interests that underlie the plaintiffs' challenge. Our conclusion is based in part on the Supreme Court's own exhaustive review of the purposes of the ESA in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 2296–97, 57 L.Ed.2d 117 (1978) (emphasis added). There, the Court concluded that:

> [t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, *whatever the cost.* That is reflected not only in the stated policies of the Act, but in literally every section of the statute.

*See also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* —— U.S. ——, ——, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995) (quoting same). The Court went on to point out that even the citizen-suit provision, on which the plaintiffs rely, was designed to serve the goal of species protection by permitting *"interested persons"* to sue to enforce the Act. *Id.* at 181, 98 S.Ct. at 2295 (emphasis added).

Moreover, a review of the section of the ESA that sets forth the Act's purposes bears out the Court's analysis. That section provides no basis for concluding that the plaintiffs' interest in obtaining water that the government deems critical to the survival of endangered fish is a protected one. Rather, the statute declares that its purposes are:

> to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b). It was a similar declaration of purpose that we relied upon in concluding that a plaintiff's economic interest fell outside the zone of interests protected by NEPA. *See Nevada Land Action,* 8 F.3d at 716 (quoting the purposes section of NEPA). Given that the clear purpose of the ESA is to ensure the protection of endangered species, we conclude that suits by plaintiffs who are interested only in avoiding the burdens of that preservation effort "are more likely to frustrate than to further statutory objectives." *Nevada Land Action,* 8 F.3d at 716 (quoting *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12).

Our conclusion echoes some of the views that we recently expressed in *Pacific Northwest.* In *Pacific Northwest,* hydropower purchasers challenged the government's preparation of a biological opinion that recommended regulating water flow in order to protect endangered salmon. In one of their claims, the hydropower purchasers contended that the opinion's recommendations would yield only "dubious benefit to the listed species" and did not adequately consider the impact that the proposed regulations would have on their industry. *Pacific Northwest,* 38 F.3d at 1067. We explained that such a claim went beyond the bounds of the standing that the ESA confers.

---

**6.** *Central Arizona Water Conservation Dist. v. United States Environmental Protection Agency,* 990 F.2d 1531 (9th Cir.1993), is not inconsistent with our analysis. In *Central Arizona,* although we conferred standing on water districts that sued to recoup the "compliance costs" imposed by the Clean Air Act, we did not consider the general question of whether the Clean Air Act protects the interests of plaintiffs who assert no interest in clean air. Instead, in our opinion, we concluded that the districts had standing because they were contractually "require[d]" to pay a substantial portion of the multi-million dollar "compliance costs" that the Act imposed directly on the Bureau of Reclamation. *Central Arizona,* 990 F.2d at 1537–1539. In *Central Arizona,* the water districts stood in the same position as the Bureau of Reclamation, the entity that the Clean Air Act regulated directly. As we noted earlier, the zone of interests test does not apply in such circumstances. *Clarke,* 479 U.S. at 400, 107 S.Ct. at 757; *supra,* note 2.

On analysis, a portion of this claim goes beyond the basis for the plaintiffs' standing because it focuses on the increases in cost to hydropower operations. The plaintiffs are entitled to standing because preservation of the salmon will, in the long run, reduce their cost. *But the plaintiffs are not entitled to standing simply to complain about the additional cost imposed on hydropower. Nothing in the Endangered Species Act confers a cause of action for that purpose.*

*Pacific Northwest,* 38 F.3d at 1067 (emphasis added). *Pacific Northwest* said, in effect, that as to a portion of their claim, the plaintiffs were not entitled to standing because they failed to assert an interest in preserving a threatened or endangered species.[7]

Here, the plaintiffs make no allegation that the government's recommendations will harm the Lost River or shortnose suckers. Instead, they argue that the actions proposed in the biological opinion are not necessary to preserve the fish. In their claims regarding consultation and designation of critical habitat, they seek only to obtain a greater share of the water and do not contend that compliance with the Act will *improve* the fish's lot. Indeed, they tell us that the suckers are doing just fine. Thus, their complaint belies any assumption that they seek compliance with the statute in order to further the goal of species preservation. The complaint instead is premised on the contrary position that the fish are "reproducing successfully"

and will not be adversely affected by the long-term operation of the Klamath project.

In short, the plaintiffs do not seek to further the statutory purpose. Nor do they allege any community of interest of any kind between themselves and the suckers. To the contrary, they claim a competing interest— an interest in using the very water that the government believes is necessary for the preservation of the species. Because the plaintiffs' interests consist solely of an economic (and recreational) interest in the use of water, because their claims are at best "marginally related" to the purposes that underlie the Act, *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757, and because, as the district court determined, their interests are inconsistent with the Act's purposes, we conclude that they lack standing.[8]

■ Finally, we are aware that the ESA specifically provides that the government should consider a variety of factors—including economic ones—in designating critical habitat for a species. *See* 16 U.S.C. § 1533(b)(3). The Act's inclusion of such directives does not alter our analysis. We do not believe that in setting forth the factors to be weighed in formulating a plan for protecting species, Congress intended to do more than ensure a rational decision-making process by providing guidance for government officials. Certainly, it did not intend impliedly to confer standing on every plaintiff who could conceivably claim that the failure to consider one of those factors adversely affected him. *See Hazardous Waste Treat-*

---

7. *Pacific Northwest* did not clearly state whether it was concluding that the ESA denied the plaintiffs standing or a cause of action. However, the distinction between "standing" and "cause of action" is often "only a matter of semantics," *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 467, 94 S.Ct. 690, 697, 38 L.Ed.2d 646 (1974), (Douglas, J., dissenting); *Pacific Northwest,* 38 F.3d at 1067, and the terms are sometimes used interchangeably or confused. *See, e.g., DKT Memorial Fund v. Agency for International Development,* 887 F.2d 275, 286 (D.C.Cir.1989) (explaining that zone of interests standing test and cause of action inquiry often meld into one) (quoting *Cardenas v. Smith,* 733 F.2d 909, 915 (D.C.Cir. 1984)); *see also McMichael v. County of Napa,* 709 F.2d 1268, 1273 (9th Cir.1983) (Kennedy, J. concurring). Thus, *Pacific Northwest*'s interchangeable use of the two terms does not consti-

tute a departure from our past practice of deeming the question of who may sue for a statutory violation as one that concerns standing. *See Alvarez v. Longboy,* 697 F.2d 1333, 1337 (9th Cir.1983); *Gonzales v. Gorsuch,* 688 F.2d 1263, 1266 (9th Cir.1982); *Dan Caputo Co. v. Russian River County Sanitation,* 749 F.2d 571, 575 (9th Cir.1984). Semantics aside, *Pacific Northwest* followed our traditional approach in assessing the interests asserted by the plaintiffs in that case.

8. The fact that the ranchers allege that they have an aesthetic and recreational interest in lower lake levels does not change anything. That interest—even though not economic in nature—does not serve the purpose of preserving any endangered species. Thus, it is not an interest protected by the ESA.

*ment Council v. Thomas,* 885 F.2d 918, 922 (D.C.Cir.1989) (holding that the fact that Congress mandates that certain methods be used to achieve its goals does not express its intent to benefit every person who has an interest in those methods being followed). To interpret the statute in the manner suggested by plaintiffs would be to transform provisions designed to further species protection into the means to frustrate that very goal. *See Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12. Accordingly, we hold that the plaintiffs have no standing under the ESA.

### V.

Because the plaintiffs have failed to assert an interest protected by the ESA, they necessarily have no standing under the APA. *Yesler Terrace,* 37 F.3d at 447 (zone of interests test applies to the APA). We also need not consider whether the plaintiffs have standing under the National Environmental Policy Act. Under the doctrine of hypothetical jurisdiction, we may dismiss a claim on the merits, if they are clear, in order to avoid a difficult jurisdictional inquiry. *Clow v. U.S. Department of Housing & Urban Development,* 948 F.2d 614, 616–17 n. 2 (9th Cir. 1991). Here, as the plaintiffs concede, *Douglas County* squarely holds that no NEPA claim lies for a violation of the ESA's provisions for determining critical habitat. *Douglas County,* 48 F.3d at 1502. Accordingly, even if we assume that the plaintiffs have standing under NEPA, they have failed to state a claim under that Act.

### VI.

Because the plaintiffs lack standing to sue under either the ESA or the APA, and because they have failed to state a claim under NEPA, we affirm the district court.

AFFIRMED.

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir. R. 34-4.